```
┌─────────────────────────────────┐
│ USDS SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #: _____          │
│ DATE FILED: 9-24-13              │
└─────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
CORPORATE TRADE, INC.,

                          Plaintiff,                                    12 Civ. 8811 (PKC)

        -against-
                                                                        MEMORANDUM
                                                                        AND ORDER

GOLF CHANNEL,

                          Defendant.
------------------------------------------------------------x
P. KEVIN CASTEL, District Judge:

        Plaintiff Corporate Trade, Inc. ("CTI") brings five claims under New York law,

asserting that defendant Golf Channel unlawfully interfered with a contractual arrangement

between CTI and a non-party media-buying firm, KSL Media, Inc. ("KSL"). CTI alleges that

there was an arrangement between Golf Channel and KSL under which KSL received

undisclosed rebates for all ads placed on Golf Channel on behalf of CTI's client, non-party

Callaway Golf Company ("Callaway"). It alleges that this arrangement injured CTI because

KSL alone made "a larger profit from placing Callaway's advertising with Golf Channel" even

though, according to CTI's contract with KSL, "all profits earned from the placement of

Callaway's advertising by KSL was to be divided equally between KSL and CTI." (Compl't ¶¶

19, 18.)

        Defendant contends that the action is time-barred, and moves to dismiss the

Complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P. Because plaintiff commenced this action

beyond the limitations period and has not alleged facts sufficient to plead that the limitations

period is equitably estopped, the Complaint is dismissed.

BACKGROUND.

    A. The Parties.

    Plaintiff CTI is a Nevada corporation with its principal place of business in New Jersey. (Compl't ¶ 1.)  CTI states that it "provides asset recovery services" to its clients by purchasing their "undervalued asset portfolios" for full book value. (Compl't ¶ 7.)  It purchases those assets using cash and trade credits. (Compl't ¶¶ 8-9.)  Trade credits "can be applied towards media advertising, event sponsorships, and other pre-budgeted corporate marketing and advertising expenditures." (Compl't ¶¶ 8.)  Defendant Golf Channel is a cable network available in more than 120 million homes. (Compl't ¶ 5.)

    According to the Complaint, Golf Channel is an LLC that "is owned by NBCUniversal Media LLC, which is owned 51% by Comcast and 49% by General Electric Company." (Compl't ¶ 4.)  In a statement filed with this Court on September 16, 2013 pursuant to Rule 7.1, Fed. R. Civ. P., counsel to Golf Channel states that, as of March 19, 2013, NBCUniversal Media LLC "is indirectly owned 100% by Comcast Corporation . . . ." (Docket # 18.)  Comcast is a Delaware corporation with its principal place of business in Pennsylvania. (Compl't ¶ 2.)

    Complete diversity exists between the parties, the Complaint properly alleges the amount in controversy, and this Court therefore has subject matter jurisdiction.  28 U.S.C. § 1332(a).

    B. The Rebate Arrangement between KSL and Golf Channel.

    According to the Complaint, in December 2001, CTI entered into a media-placement agreement with KSL. (Compl't ¶ 13.)  Under the terms of this agreement, CTI

outsourced certain media-buying duties to KSL, with KSL working at the direction of CTI. (Compl't ¶ 13.) All clients who used KSL's services "expressly" remained the clients of CTI. (Compl't ¶ 13.) The agreement included provisions on the division of profits and losses between KSL and CTI, as well as auditing requirements. (Compl't ¶ 14.)

The Complaint alleges upon information and belief that sometime in or around 2003, KSL and Golf Channel entered into an arrangement whereby Golf Channel provided a 10% rebate to KSL for its media placements on Golf Channel. (Compl't ¶ 19.) CTI asserts that KSL then placed advertisements on Golf Channel for a CTI client, Callaway, which resulted in KSL "making a larger profit from placing Callaway's advertising with Golf Channel." (Compl't ¶ 19.) The rebate was not disclosed to CTI or Callaway. (Compl't ¶¶ 19-20.) Plaintiff asserts that Golf Channel made "numerous inappropriate and undisclosed rebate payments to KSL," which resulted in "substantial" benefits to Golf Channel and KSL "at the direct and proximate cost to Callaway and CTI." (Compl't ¶ 22.) CTI asserts that it "was entitled to receive from Callaway a percentage of the value of cash savings on media purchases that Callaway realized from the use of CTI's media buying expertise or trade credits3 provided by CTI." (Compl't ¶ 20.)

C. CTI's Actions upon Learning of the KSL/Golf Channel Rebate.

According to the Complaint, at an unspecified date, Brian Egan, who is CTI's president and CEO, "eventually suspected that KSL was acting improperly and in bad faith in connection with the media purchases for Callaway," and estimated that the rebates were costing Callaway hundreds of thousands of dollars per year. (Compl't ¶¶ 7, 23.) Egan informed Callaway of his suspicions. (Compl't ¶ 23.) CTI and Callaway then entered into a

confidentiality agreement pursuant to which they agreed to share any recovery from KSL or Golf Channel. (Compl't ¶ 23.)

       The Complaint alleges upon information and belief that in 2008, Callaway reached settlements with both KSL and Golf Channel. (Compl't ¶¶ 24-25.) Consistent with the CTI-Callaway confidentiality agreement, from 2008 to 2010, Callaway made payments to CTI in connection with the settlements. (Compl't ¶ 26.) According to the Complaint, at the time of these 2008 settlements, CTI still did not know or suspect that Golf Channel was aware of CTI's contracts with KSL and Callaway. (Compl't ¶ 23.)

       Egan later concluded, however, that the Golf Channel had undertaken "deliberate conduct" concerning the KSL rebates. (Compl't ¶ 27.) The Complaint asserts that Golf Channel "implicitly acknowledged its complicity and culpability" in the KSL arrangement through its "substantial settlement" with Callaway in 2008. (Compl't ¶ 28.) However, CTI contends that it was unaware of Golf Channel's purported misconduct until Callaway filed an action against CTI in this district, Callaway Golf Company v. Corporate Trade, Inc., 10 Civ. 1676 (GBD). (Compl't ¶ 29.) At that point, CTI learned that Golf Channel "deliberately" engaged in the KSL arrangement with knowledge of the damage that it caused CTI. (Compl't ¶ 29.)

       According to the Complaint in this action, on or about January 25, 2011, KSL's former CFO informed Egan that Golf Channel had known all along that Callaway was a CTI client. (Compl't ¶ 30.) KSL's former CFO told Egan that Golf Channel had reviewed documents "produced by KSL" that described "how CTI would be directly impacted by the KSL-Golf Channel Scheme." (Compl't ¶ 30.) The Complaint asserts on information and belief that Golf Channel generated invoices that were intended to mislead CTI about the true costs of KSL's ad placements. (Compl't ¶¶ 31-32.) The rebates could not have been discovered through

an audit or comparable due diligence, the Complaint alleges. (Compl't ¶ 32.) The Complaint asserts that Golf Channel had "actual or constructive knowledge" that KSL submitted misleading reports to CTI. (Compl't ¶ 33.) CTI asserts that false invoices from Golf Channel to KSL were necessary in order to conceal the rebate arrangement from CTI. (Compl't ¶¶ 34-35.)

CTI now brings claims against Golf Channel, alleging that the rebate arrangement unlawfully interfered with CTI's contract with KSL. The Complaint asserts claims for tortious interference with contract, "malicious interference" with contract, intentional or "malicious" interference with economic advantage, aiding and abetting and civil conspiracy. (Compl't ¶¶ 38-68.)

D. Previous Litigations.

Plaintiff previously commenced an action against Golf Channel in the District of New Jersey, asserting the same claims raised here. Corporate Trade, Inc. v. Golf Channel, 12 Civ. 2421 (WHW) (D.N.J.). In an unpublished opinion dated October 11, 2012, the Hon. William H. Walls granted Golf Channel's motion to dismiss for improper venue. (12 Civ. 2421 (D.N.J.), Docket # 17.) In contrast to this action, where Golf Channel is identified as a LLC, Golf Channel was identified in the New Jersey action as a Delaware corporation with its principal place of business in Florida. (Id. at 4-5.) Judge Walls concluded that none of the key events raised in the complaint occurred in New Jersey and that Golf Channel lacked minimum contacts with New Jersey. (Id. at 4-7.) He observed that venue might properly lie in the Middle District of Florida, where Golf Channel maintains its offices, or in the Southern District of New York, where the underlying contracts were negotiated and performed. (Id. at 7.) The complaint was dismissed without prejudice to re-filing in a different venue, and did not address the merits of CTI's claims. (Id. at 9.)

Additionally, as noted, Callaway previously brought claims against CTI in this district. Callaway Golf Co. v. Corporate Trade Inc., 10 Civ. 1676 (GBD) (S.D.N.Y.). Callaway alleged that CTI failed to properly allocate trade credits to Callaway, and asserted tort and breach-of-contract claims. (10 Civ. 1676, Docket # 1.) In a related 2009 action, CTI brought claims against Callaway, asserting that Callaway had failed to make full payment for CTI's services. Corporate Trade Inc. v. Callaway Golf Co., 09 Civ. 698 (GBD) (S.D.N.Y.). Both of these actions were voluntarily dismissed upon settlement.

RULE 12(b)(6) STANDARD

A defendant may assert a statute-of-limitations defense "in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint." Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008). "Timeliness is 'material when testing the sufficiency of a pleading.'" Id. (quoting Rule 9(f), Fed. R. Civ. P.)

To survive a motion to dismiss for failure to state a claim upon which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In assessing a complaint, courts draw all reasonable inferences in favor of the non-movant. See In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007). Legal conclusions, however, are not entitled to any presumption of truth, and a court assessing the sufficiency of a complaint disregards them. Iqbal, 556 U.S. at 678. Instead, the court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief." Id. at 679.

DISCUSSION

> A. There Is No Dispute that Plaintiff's Claims Are Governed by New York's
> Three-Year Statute of Limitations.

In a diversity action, a federal court applies the statute of limitations of the forum state. See Stuart v. American Cyanamid Co., 158 F.3d 622, 626 (2d Cir. 1998) ("Where jurisdiction rests upon diversity of citizenship, a federal court sitting in New York must apply the New York choice-of-law rules and statutes of limitations."). Under New York's borrowing statute, CPLR 202, when a non-resident brings a claim that accrued outside of New York, "the action must be timely in both New York and the other jurisdiction." Oxbow Calcining USA Inc. v. American Indus. Partners, 96 A.D.3d 646, 651 (1st Dep't 2012); CPLR 202 ("An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply.").

New York has a three-year statute of limitations for any "action to recover damages for an injury to property . . . ." CPLR 214(4). New Jersey has a six-year limitations period. See N.J. Stat. Ann. § 2A:14-1. Because New York's borrowing statute, CPLR 202, applies whichever limitations period is shortest, New York's three-year limitations period governs. See, e.g., Ackerman v. Price Waterhouse, 252 A.D.2d 179, 191 (1st Dep't 1998) (CPLR 202 "provides that in actions brought by non-New York residents, the shorter of the New York Statute of Limitations or the limitations period of the jurisdiction where the cause of action accrued will apply.").

B.  Plaintiff's Claims Accrued More Than Three Years Prior to Commencement
of this Action.

Under New York law, "[t]he time within which an action must be commenced,
except as otherwise expressly prescribed, shall be computed from the time the cause of action
accrued to the time the claim is interposed." CPLR 203(a).  Unless there is an applicable
exception, the accrual date begins to run when "an injury is sustained," and not from "the
wrongful act of defendant or discovery of the injury by plaintiff . . . ."  Kronos, Inc. v. AVX
Corp., 81 N.Y.2d 90, 94 (1993); see also Vincent C. Alexander, Practice Commentaries, CPLR §
203, McKinneys Cumulative Pocket Part at 65 (2013) ("The well-settled New York rule is that a
cause of action accrues, and the statute of limitations begins to run, upon the happening of the
wrong, not the plaintiff's discovery of the injury.").

As noted, the Complaint asserts claims for tortious interference with contract,
"malicious interference" with contract, intentional or "malicious" interference with economic
advantage, aiding and abetting and civil conspiracy.  New York authority does not recognize
malicious interference as a separate cause of action, and instead includes maliciousness as an
element of tortious interference.  See, e.g., AJW Partners, LLC v. Admiralty Holding Co., 93
A.D.3d 486, 486 (1st Dep't 2012) (dismissing tortious interference claim because there was no
allegation that defendant's conduct "was malicious").  The Court therefore treats plaintiff's
"malicious interference" and tortious interference claims as identical and overlapping.

Tortious interference claims are not continuing torts.  See Kronos, 81 N.Y.2d at
94 (in a tortious interference with contract claim, time begins to run from date of injury); Thome
v. Alexander & Louisa Calder Found., 70 A.D.3d 88, 108 (1st Dep't 2009) (a claim for tortious
interference with prospective business advantage "begins to run when the defendant performs the
action (or inaction) that constitutes the alleged interference" and "does not commence anew each

time the plaintiff is unable to enter into a contract, unless the defendant takes some further step."); Sinap Corp. v. Cafagno, 302 A.D.2d 588, 588 (2d Dep't 2003) ("tortious interference with contract is not a continuing tort . . . ."). Therefore, the limitations period for these claims began to accrue from the point that KSL and Golf Channel entered into their allegedly unlawful arrangement.

Separately, New York law does not recognize "aiding and abetting" or "civil conspiracy" as freestanding causes of action. They are wholly derivative of the underlying acts of alleged wrongdoing. See, e.g., Dickinson v. Igoni, 76 A.D.3d 943, 945 (2d Dep't 2010) (New York recognizes a claim for aiding and abetting a tort, but such a claim is dependent on the existence of the underlying tort); Salvatore v. Kumar, 45 A.D.3d 560, 563-64 (2d Dep't 2007) ("New York does not recognize a civil conspiracy to commit a tort as an independent cause of action. Such a claim stands or falls with the underlying tort.") (quotation marks and internal citation omitted). Thus, the limitations periods for plaintiff's claims for aiding and abetting and civil conspiracy began to run on the accrual date of plaintiff's tortious interference claim.

Based on the face of the Complaint, plaintiff's claims began to accrue approximately nine years before the filing of this action, placing them well outside of the three-year limitations period. According to the Complaint, "sometime in or about 2003," KSL and defendant Golf Channel agreed to the rebate arrangement for ads that KSL placed with Golf Channel. (Compl't ¶ 19.) Because tortious interference claims are measured from the date of injury and not the date of discovery, Kronos, 81 N.Y.2d at 94, the limitations period began to run "sometime in or around 2003." (Compl't ¶ 19.)

But even if measured from the date of discovery, the Complaint plausibly alleges awareness on the part of CTI sometime in 2008. True, the Complaint does not specify a date

when Egan became aware of the rebate arrangement and notified Callaway of his suspicions, and also does not allege the date at which CTI and Callaway entered the contract agreeing to share any recovery from KSL or Golf Channel. (Compl't ¶ 23.) However, in June 2008, Callaway "entered into a settlement" with KSL, and separately settled with Golf Channel in August 2008. (Compl't ¶ 24.) Because Callaway acted on information supplied by CTI, under the Complaint's own allegations, CTI was necessarily aware of the rebate arrangement sometime prior to June 2008. The Complaint here was filed on December 4, 2012, approximately four-and-a-half years after June 2008.

Therefore, unless "otherwise expressly prescribed," CPLR 203(a), plaintiffs' claims are subject to the three-year limitations period of CPLR 214(4).

### C.   Plaintiff Has Not Pleaded Facts to Support Its Equitable Estoppel Argument.

Plaintiff asserts that the Court should deem its action timely based on principles of equitable estoppel. In raising this argument, plaintiff has "the burden to adequately plead facts which, if proven, would establish the existence of an equitable estoppel." Paterra v. Nationwide Mut. Fire Ins. Co., 38 A.D.3d 511, 512 (2d Dep't 2007) (quotation marks and alteration omitted).[1]

If a defendant's "affirmative wrongdoing" is responsible for the delay between a cause of action's accrual and the filing of a lawsuit, that defendant may be equitably stopped from asserting a statute-of-limitations defense. Putter v. N. Shore Univ. Hosp., 7 N.Y.3d 548, 552 (2006). "Equitable estoppel is appropriate where the plaintiff is prevented from filing an action within the applicable statute of limitations due to his or her reasonable reliance on

---

[1] To the extent that plaintiff also appears to contend that federal common law may play a role in tolling analysis (Opp. Mem. at 19-20), that argument is without merit. See, e.g., Cantor Fitzgerald Inc. v. Lutnick, 313 F.3d 704, 709 (2d Cir. 2002) ("[I]t is well established that in diversity cases state law governs not only the limitations period but also the commencement of the limitations period.")

deception, fraud or misrepresentations by the defendant." Id. at 552-53; see also Nichols v.
Curtis, 104 A.D.3d 526, 528 (1st Dep't 2013) (plaintiff must "allege specific actions by
defendants that kept her from timely bringing suit; mere failure to disclose wrongdoing is not
sufficient.") (citing Putter, 7 N.Y.3d at 553); Neil v. City of N.Y., 95 A.D.3d 608, 608 (1st Dep't
2012) (not applying equitable estoppel where "there is no evidence in the record that defendants
lulled plaintiff into inaction in order to allow the statute of limitations to expire."). If a plaintiff
is placed on notice of potential wrongdoing but takes no steps to investigate further, equitable
estoppel does not apply. Putter, 7 N.Y.3d at 553-54; Neil, 95 A.D.3d at 608 (no equitable
estoppel because "plaintiff has failed to show due diligence").

Paragraph 30 of the Complaint asserts that "[o]n or about January 25, 2011,
KSL's former CFO informed Egan for the first time" that Golf Channel knew from the outset
that Callaway was a CTI client, and knew "how CTI would be directly impacted by the KSL-
Golf Channel Scheme." (Compl't ¶ 30.) CTI argues that it was previously unaware of Golf
Channel's wrongdoing "due to Golf Channel's own extensive efforts" to conceal the
arrangement. (Opp. Mem. at 19.)

But, as noted, CTI alerted Callaway to the rebate arrangement sometime prior to
June 2008, executed a confidentiality agreement "concerning any recovery by Callaway from
KSL and/or Golf Channel in connection with the Scheme," and received payment from Callaway
under the confidentiality agreement from August 2008 to August 2010. (Compl't ¶¶ 23-26.)
CTI asserts that Golf Channel "implicitly acknowledged its complicity and culpability in the
illegal KSL-Golf Channel Scheme by paying a substantial settlement amount to Callaway."
(Compl't ¶ 28.) Thus, according to CTI's own allegations, Golf Channel "acknowledged its
complicity and culpability" in or around August 2008. (Compl't ¶¶ 25, 28.) Based on the

Complaint's express allegations, CTI then had notice of potential wrongdoing, but took no steps to further investigate Golf Channel. Putter, 7 N.Y.3d at 553-54; see also Neil, 95 A.D.3d at 608 (no equitable estoppel because "plaintiff has failed to show due diligence").

Even if the Complaint included no allegations concerning the August 2008 Golf Channel/Callaway settlement, and did not allege that it was an implicit acknowledgement of Golf Channel's culpability, the Complaint still fails to allege facts that plausibly support plaintiff's equitable estoppel argument. The Complaint alleges "no specific actions" by Golf Channel regarding "failure to disclose wrongdoing." Nichols, 104 A.D.3d at 528. It includes no allegations that Golf Channel "lulled plaintiff into inaction in order to allow the statute of limitations to expire." Neil, 95 A.D.3d at 608.

The Complaint also asserts Golf Channel generated invoices that were "intended to mislead" CTI about the rebates, and concealed the rebates from any auditors' reviews. (Comnpl't ¶ 31-35.) However, if accepted as true, these allegations still would not plausibly allege equitable estoppel in light of the Complaint's allegations going to information that was allegedly known to plaintiff by August 2008, at the latest. (Compl't ¶¶ 23-25.)

The Complaint therefore fails to allege facts that could plausibly equitably estop defendant from asserting a statute of limitations defense.

CONCLUSION

The defendant's motion to dismiss is GRANTED.  (Docket # 12.)  The Clerk is directed to terminate the motion and to enter judgment for the defendant.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       September 24, 2013